# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUBRIL PECOU, individually and as the representative of a class of similarly situated persons, and on behalf of the Bessemer Trust Company 401(k) and Profit Sharing Plan,<br><br>      Plaintiff,<br><br>v.<br><br>BESSEMER TRUST COMPANY and PROFIT SHARING PLAN COMMITTEE OF BESSEMER TRUST COMPANY<br><br>      Defendants. | Case No. 2:22-cv-00377<br><br>**COMPLAINT – CLASS ACTION** |

Katrina Carroll
NJ Bar No. 026212000
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (773) 598-5609
katrina@lcllp.com

[Additional counsel listed below]

*Attorneys for Plaintiff*

## LOCAL CIVIL RULE 10.1 STATEMENT

1.     The mailing addresses of the parties to this action are:

Jubril Pecou
3320 Avenue H
Apt 3C
Brooklyn, NY 11210

Bessemer Trust Company
100 Woodbridge Center Drive
Woodbridge, NJ 07095

Profit Sharing Plan Committee of Bessemer Trust Company
100 Woodbridge Center Drive
Woodbridge, NJ 07095

## NATURE OF THE ACTION

2.     Plaintiff Jubril Pecou ("Plaintiff"), individually and as the

representative of the Class described herein, and on behalf of the Bessemer Trust

Company 401(k) and Profit Sharing Plan (the "Plan"), brings this action under the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §

1001, et seq. ("ERISA"), against Defendants Bessemer Trust Company

("Bessemer Trust") and the Profit Sharing Plan Committee of Bessemer Trust

Company (the "Committee") (collectively, "Defendants"). As described herein,

Defendants have breached their fiduciary duties and engaged in unlawful self-

dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan,

its participants, and its beneficiaries. Plaintiff brings this action to remedy this

unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## **INTRODUCTION**

3.     As of the third quarter of 2021, Americans had approximately $10.4 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Since the passage of Section 401(k) of the Internal Revenue Code in 1978 only 15% of private-sector workers have access to pension plans, meaning 401(k) type plans have replaced pensions to become the most common retirement program for American workers.[2]

4.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Because the sponsor is responsible for making sure that the plan is sufficiently capitalized, the

---

[1] *See* Investment Company Institute, *Retirement Assets Total $37.4 Trillion in Third Quarter 2021* (Dec. 2021), *available at* https://www.ici.org/statistical-report/ret_21_q3 (last visited Jan. 26, 2022).

[2] *See* Investopedia, *The Demise of the Defined-Benefit Plan* (Nov. 28, 2021), *available at* https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp (last visited Jan. 26, 2022); CNBC, *How 401(k) Accounts Killed Pensions to Become One of the Most Popular Retirement Plans for U.S. Workers* (Mar. 24, 2021), *available at* https://www.cnbc.com/2021/03/24/how-401k-brought-about-the-death-of-pensions.html (last visited Jan. 26, 2022).

sponsor bears all risks related to excessive fees and investment underperformance and has every incentive to keep costs low and promptly remove imprudent investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015); *see also Thole*, 140 S. Ct. at 1618 (noting that in defined contribution plans, retirees' level of benefits "can turn on the plan fiduciaries' particular investment decisions"). Thus, because all risks related to high fees and poorly performing investments are borne by participants, the sponsor has no direct stake in keeping costs low or closely monitoring the plan to ensure every investment remains prudent.

5.     The real-life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.[3] Put another way, excessive fees can force an employee to work an extra five to six years to make up for the imprudent management of a retirement plan.

---

[3] *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN Money (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/ (last visited Jan. 26, 2022).

6.     For financial services companies like Bessemer Trust, which serves as the advisor to the Old Westbury line of mutual funds through its subsidiary Bessemer Investment Management LLC, the potential for imprudent and disloyal conduct is especially high, because the Plan's fiduciaries are positioned to benefit the company through the Plan by, for example, using proprietary investment products that a non-conflicted and objective fiduciary would not select or retain.

7.     To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. University of Pennsylvania*, 923 F.3d 320, 333 (3rd Cir. 2019) (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 355-56 (4th Cir. 2014). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.     Contrary to these fiduciary duties, Defendants have failed to administer the Plan in the best interest of participants and failed to employ a prudent process for managing the Plan. Instead, Defendants have managed the Plan in a manner that benefits Bessemer Trust at participants' expense, using the Plan as

an opportunity to promote Bessemer Trust's Old Westbury mutual fund business and maximize profits in lieu of participants' best interests.

9.     Defendants' favoritism shown toward Bessemer Trust's proprietary investments (the "Old Westbury Funds" or "proprietary funds") is evident through a simple comparison to other similarly sized plans. Among all plans with at least $100 million in assets, ***no plan*** other than the Plan is invested in a single Old Westbury fund. Despite the Old Westbury Funds' clear disfavor among similarly situated plan fiduciaries, Defendants have selected and retained a lineup of funds laden with Old Westbury Funds.  Indeed, Defendants have not passed up a single opportunity to self-deal in the Plan: the only non-Old Westbury options in the Plan represent 401(k)-staple asset classes or investment styles for which Old Westbury does not maintain a proprietary offering.[4]

10.    Defendants' proclivity for proprietary mutual funds has cost Plan participants millions of dollars in excess fees. For plans with $100 million to $500 million in assets, like the Plan, the average asset-weighted total plan cost is between 0.42% and 0.47%.[5] In contrast, the Plan's total costs were approximately

---

[4] The Plan's capital preservation option is managed by State Street Global Advisors, as Old Westbury does not offer its own capital preservation or money market fund. In 2017, two Vanguard index mutual funds were added to the Plan, as Old Westbury does not offer passively managed investments.

[5] INVESTMENT COMPANY INSTITUTE, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018, at 55 (Jul. 2021), *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

*two times* higher, ranging from 0.73% to 0.99% throughout the statutory period.[6] The Plan's excessive fees are entirely due to its concentration of proprietary funds, which, on average, account for over **98%** of the Plan's investment expenses.

11.     Defendants' favoritism towards Old Westbury Funds has not only led to the retention of overpriced proprietary funds, but also the retention of underperforming proprietary funds. For example, the Old Westbury Large Cap Strategies fund, the Plan's largest holding, trailed its benchmark by a staggering 6.40% percent *per year* over the five-year period ending 2020.

12.     Defendants' preference for proprietary investments has also harmed participants through the selection of new funds for the Plan. Despite Old Westbury Funds' miniscule 0.23% industry market share, Defendants failed to look beyond their proprietary lineup of mutual funds when considering actively managed investments for the Plan. Defendants did not consider a non-Old Westbury actively managed fund for inclusion in the Plan at any time throughout the statutory period.

---

(hereinafter "2018 ICI Study"). The Investment Company Institute is the leading trade association for the mutual fund industry. *Id.* at 86. The report's measure of average total plan costs is derived from audited Form 5500 reports for more than 56,000 private-sector 401(k) plans for the 2018 plan year. *Id.* at 8. The measure of a plan's fees is derived from the fees reported on the Form 5500 reports as well as the fees paid through investment expense ratios. *Id.* at 9.

[6] The Plan's total costs fell below 0.90% only after the introduction of two Vanguard index funds to the Plan in 2017. Excluding the Vanguard index funds and State Street capital preservation option results in total plan costs of between 0.95% and 1.07% throughout the statutory period.

For example, in 2020 Defendants imprudently and disloyally added the Old Westbury Credit Income fund to the Plan's lineup within three months of its inception despite a multitude of superior, lower cost non-proprietary options with proven track records available in the marketplace. Defendants consistently selected and retained Old Westbury Funds to benefit their business interests at the expense of the Plan's participants' retirement savings.

13.    Courts have reasonably determined that similar conduct by other financial services companies is sufficient to state a claim for breach of fiduciary duty. *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-cv-10397, 2020 WL 8575183, at *1 (D. Mass July 23, 2020) (allegations that proprietary funds underperformed relative to their custom benchmarks and to similar market comparators, and that "no other fiduciary managing a like-sized plan chose to offer the proprietary funds," sufficiently stated a claim); *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153, 2019 WL 7482134, at *5 (S.D. Ohio Sept. 26, 2019) (breach of fiduciary duty claim sufficiently stated where plaintiffs allege that the proprietary funds offered by the plan were more expensive than similar alternatives and that the higher fees were unjustified); *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018) (claim for breach of fiduciary duties is sufficiently stated where a plaintiff "plausibly alleges that the higher fees were unjustified or otherwise improper"); *Main v. Am. Airlines Inc.*,

248 F. Supp. 3d 786, 793 (N.D. Tex. 2017) (allegation that proprietary mutual funds "were more expensive than similar alternatives" supported claim of fiduciary breach); *Moreno v. Deutsche Bank Am. Holding Corp.*, No. 15-cv-9936, 2016 WL 5957306, at *6 (S.D.N.Y. Oct. 13, 2016) (allegations of excessive fees in connection with proprietary funds were sufficient to raise an inference that defendants' process was flawed); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) (allegations that proprietary mutual funds were selected to benefit plan sponsor, and that the retention of the high-cost investment options was to the detriment of participants, sufficiently stated a claim for breach of fiduciary duties).

14.     By selecting and retaining Old Westbury Funds as investment options within the Plan in lieu of superior alternative options utilized by similarly situated fiduciaries, Defendants have failed to act in the best interest of participants and exercise appropriate care, costing participants millions of dollars in excess fees and investment underperformance.

15.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One). Plaintiff also asserts a claim against Defendant Bessemer Trust Company for its failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

16.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

17.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

18.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

19.     Plaintiff Jubril Pecou resides in Brooklyn, New York and was a participant in the Plan until 2020. As a Plan participant, Plaintiff invested in multiple investment options managed by Bessemer Trust through its Old Westbury Funds and has been financially injured by the unlawful conduct described herein.

Plaintiff's account would be worth more today had Defendants not violated ERISA as described herein.

THE PLAN

20.     The Bessemer Trust Company 401(k) and Profit Sharing Plan was established by Bessemer Trust Company on December 1, 1965.

21.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Bessemer Trust Company, The Bessemer Group, Inc., Bessemer Investment Management LLC, Bessemer Trust Company of Delaware, N.A., and Bessemer Trust Company of Florida, including Plaintiff. The Plan is a qualified plan under 26 U.S.C. § 401 and is of the type commonly referred to as a "401(k) plan."

22.     The Plan has held approximately $240 million to $500 million in assets during the statutory period. The Plan has also had approximately 1,000 to 1,300 active participants with balances at any time during the relevant period.

23.     Participants may direct a portion of their earnings to their account in the Plan, and participants also may receive contributions from Bessemer Trust and participating affiliates as their employer. Participant contributions are held in trust.

24.     Participants in the Plan may direct the investment of their account assets from among the lineup of designated investment alternatives (a/k/a

investment options) offered by the Plan.[7] Because the Committee determines the designated investment alternatives that are offered, the investment lineup maintained by the Committee is critical to participants' investment results and, ultimately, the retirement benefits they receive.

25.     The Plan's investment menu has consisted of five actively managed Old Westbury Funds, one capital preservation option managed by State Street Global Advisors, and, beginning in 2017, two passively managed Vanguard mutual funds. The Plan's default investment is the Balanced Growth Model, which provides a mix of equity and fixed income exposure through investment in the Plan's various investment options (which, as described above, are predominately Old Westbury Funds).

<div align="center">DEFENDANTS</div>

**Bessemer Trust Company**

26.     Defendant Bessemer Trust Company is a New Jersey state chartered bank and depository trust company located in Woodbridge, New Jersey.

27.     Bessemer Trust is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has the ultimate authority to control and manage the operation and administration of the Plan. Because Bessemer Trust exercises discretionary

---

[7] Participants in a defined contribution plan are limited in their investment choices to the lineup of options offered by their plan. *See* 2018 ICI Study at 8.

authority or control with respect to management and administration of the Plan and disposition of Plan assets, Bessemer Trust is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

28.     Bessemer Trust is also a fiduciary because it has authority to appoint and remove members of the Committee. It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502, 509 (E.D. Pa. 2001) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1464-65 (4th Cir. 1996)).

29.     The responsibility for appointing and removing members of such a committee carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory mandates. 29 C.F.R. § 2509.75-8 (FR-17); *Luense v. Konica Minolta Business Solutions U.S.A., Inc.*, 2021 WL 2103231, at *10 (D.N.J. May 24, 2021); *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019); *Mehling*, 163 F. Supp. 2d at 509; *In re RCN Litig.*, Civ. Act. No. 04-5068, 2006 WL 753149, at *9 (D.N.J. Mar. 21, 2006). Furthermore, this monitoring duty carries with it a responsibility to "take required corrective action" upon discovery of possible deficiencies. *Scalia*, 417 F. Supp. 3d at 671 (citing *In re Williams Co.*

*ERISA Litig.*, No. 02-153 (N.D. Okla. Aug. 22, 2003) (DOL Amicus Brief, at 5, 8-9)).

### *Profit Sharing Plan Committee of Bessemer Trust Company*

30.     Bessemer Trust delegates a portion of its fiduciary responsibilities for investing Plan assets to the Profit Sharing Plan Committee of Bessemer Trust Company. Among other things, the Committee is responsible for maintaining the Plan's investment lineup, including monitoring the Plan's designated investment alternatives and making changes as appropriate. The Committee is therefore a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A). According to the Plan's Forms 5500, the Committee is also the "plan administrator" within the meaning of 29 C.F.R. § 2509.75-8 at D-3. Thus, the Committee is also a named fiduciary pursuant to 29 U.S.C. § 1102(a).

31.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## **ERISA FIDUCIARY DUTIES**

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)   for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)   defraying reasonable expenses of administering the plan;

    (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

33.    These statutory parameters of loyalty and prudence "impose a fiduciary standard that is considered 'the highest known to law.'" *Sweda*, 923 F.3d at 333 (quoting *Tatum*, 761 F.3d at 355-56).

### DUTY OF LOYALTY

34.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d. Cir. 1995)). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G Bogert et al., *Law*

*of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quotation omitted); *see also Sweda*, 923 F.3d at 327-28. This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Intern.*, 575 U.S. 523, 529 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d

16

257, 271 (D. Mass. 2008) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)). It is no defense to the imprudence of some investments that others may have been prudent; a meaningful mix and range of investment options does not insulate plan fiduciaries from liability for breach of fiduciary duty. *Sweda*, 923 F.3d at 330.

## **DEFENDANTS' VIOLATIONS OF ERISA**

**I.    DEFENDANTS USED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLAN**

36.    As discussed below, Defendants constructed and maintained a Plan investment lineup which was unlike that of any similarly sized plan. Defendants' selection of proprietary investments that were shunned by other fiduciaries resulted in unnecessarily high costs for the Plan and siphoned assets from Plan participants to Bessemer Trust. In addition, Defendants' process for evaluating and monitoring the Plan's investments gave preferential treatment to proprietary investments, failed to properly consider alternative investments, and failed to control Plan costs, in violation of ERISA's fiduciary standards.

37.    As of the end of 2015 and at the beginning of the statutory period, Defendants offered six designated investment alternatives within the Plan: Old Westbury Fixed Income, Old Westbury Large Cap Core, Old Westbury Large Cap Strategies, Old Westbury Small & Mid-Cap, Old Westbury Strategic Income Opportunities, and State Street Institutional U.S. Government Money Market. As

of the end of 2020, Defendants continue to offer five Old Westbury Funds,[8] the State Street money market, and two Vanguard index funds.

38.     Despite the significant presence of Old Westbury Funds within the Plan, Bessemer Trust's standing in the retirement plan marketplace is essentially nonexistent. Fiduciaries of other defined contribution plans have wholly rejected the Old Westbury Funds retained for the Plan. Of the 4,337 defined contribution plans with at least $200 million assets, Plaintiff is not aware of a single plan, other than the Plan, that invests in *any* Old Westbury Fund. This disfavor is also reflected in the mutual fund marketplace as a whole, where Old Westbury maintains a 0.23% market share as of year-end 2021, declining from a 0.24% market share at the end of 2015.[9] Yet, throughout the statutory period, Defendants have selected and maintained an investment lineup in which *all* of the actively managed funds available to Plan participants are Old Westbury Funds.

---

[8] As of year-end 2020, the Plan's proprietary lineup included Old Westbury Large Cap Strategies, Old Westbury Fixed Income, Old Westbury All Cap Core, Old Westbury Small & Mid Cap Strategies, and Old Westbury Credit Income. Old Westbury Large Cap Core was renamed Old Westbury All Cap Core in 2017, and Old Westbury Strategic Income Opportunities was renamed Old Westbury Multi-Asset Opportunities in 2019, prior to its liquidation in 2020.

[9] This miniscule market share is not a reflection of the limited number of Old Westbury Fund offerings, but instead a byproduct of the Funds' high fees and prolonged underperformance. For example, Dodge & Cox, which offers fewer individual mutual funds than Old Westbury, has maintained a market share five to six times that of Old Westbury since 2015.

39.     Based on the actions of similarly situated fiduciaries and comparison of the Old Westbury Funds to marketplace alternatives, Defendants appear to display favoritism toward Bessemer Trust's proprietary Old Westbury Funds in maintaining the Plan's investment menu. This favoritism has led to the payment of excessive investment management fees by participants to Bessemer Trust and its affiliates, a failure to prudently monitor and remove underperforming proprietary Plan investment options, and a failure to engage in a prudent and loyal process in the selection of new Plan investment options.

### A. Defendants' Unwavering Use of Proprietary Actively Managed Funds Caused Participants to Incur Excessive Fees

40.     The Old Westbury Funds in the Plan are actively managed and serve as the only actively managed investments available to participants. While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to lower-cost alternatives, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90 cmt. h(2); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). As discussed below, the Old Westbury Funds did not earn their fees. *See infra* at § I.B

41.     Moreover, even in comparison to other *actively* managed funds, the Old Westbury Funds charged higher fees relative to non-proprietary alternatives used by similarly sized plans. Accordingly, it is reasonable to infer that Defendants failed to prudently investigate lower-cost, nonproprietary alternatives. *See*, *e.g., Luense*, 2021 WL 2103231, at *8.

42.     Because the Plan is laden with high-cost, proprietary Old Westbury Funds, the Plan's expenses are significantly higher than other comparable retirement plans. Throughout the statutory period, annual fees paid by Plan participants were at least 0.73% to 0.99% of total Plan assets, consistently higher than the average 401(k) plan.[10] For example, the average 401(k) plan with $100 million to $500 million in assets had total plan costs between 0.44% and 0.50% in 2016, down to between 0.42% and 0.47% in 2018, the most recent year for which total plan cost data is available.[11] Thus, throughout the statutory period, the Plan's

---

[10] Total plan cost, as determined by the BrightScope/ICI Defined Contribution Plan annual profiles, "includes asset-based investment management fees, asset-based administrative and advice fees, and other fees (including insurance charges) from the Form 5500 and audited financial statements of ERISA-covered DC plans." 2018 ICI Study 80.

[11] Total plan cost in 2016, as determined by BrightScope averaged 0.50% for plans with $100 million to $250 million in assets, and 0.44% for plans with $250 million to $500 million in assets. Total plan cost for 2018, as determined by BrightScope, averaged 0.47% for plans with $100 million to $250 million in assets, and 0.42% for plans with $250 million to $500 million in assets.

expenses were around 50% to 100% higher than the total expenses incurred by the average similarly sized 401(k) plan.

43.     The Plan's excessive fees are due to the excess fees of the Old Westbury Funds.[12] In 2018, the most recent year for which average fee data is available, the Old Westbury Funds' fees exceeded the average expense ratio for funds within the same asset class category among plans with $100 million to $500 million in assets by anywhere from 82% to 130%. When looking solely at leading actively managed funds invested in similar styles to the Old Westbury Funds, the excessive fees range from 26% to 193% above average:

---

[12] The Plan's non-Old Westbury investments are low-cost index funds, ranging between 0.04% and 0.08% in fees, and a money market fund that charges 0.15% in fees.

| Proprietary Domestic Equity Fund (Ticker) | ICI/Brightscope Category/ Morningstar Global Category | Fund Net Expense Ratio (2018) | Average 401(k) Fund Expense Ratio (2018)[13] | Percentage Fee Excess Over 401(k) Average | Average Actively Managed Expense Ratio (2018)[14] | Percentage Fee Excess Over Actively Managed Average |
|---|---|---|---|---|---|---|
| Old Westbury All Cap Core (OWACX) | Domestic Equity/US Equity Large Cap | 0.99% | 0.43% | 130% higher | 0.34% | 191% higher |
| Old Westbury Large Cap Strategies (OWLSX) | International Equity/Global Equity Large Cap | 1.12% | 0.57% | 100% higher | 0.62% | 81% higher |
| Old Westbury Small & Mid Cap (OWSMX) | International Equity/Global Equity Mid-Small Cap | 1.12% | 0.57% | 100% higher | 0.89% | 26% higher |
| Old Westbury Fixed Income (OWFIX) | Domestic Bond/US Fixed Income | 0.62% | 0.36% | 82% higher | 0.32% | 93% higher |
| Old Westbury Strategic Opportunities (OWSOX) | Other/Cautious Allocation | 1.38% | 0.63% | 122% higher | 0.47% | 193% higher |

44.     Despite the high cost of the proprietary investments in the Plan,

Defendants failed to consider removing the Old Westbury Funds in favor of lower-

---

[13] For plans with $100 million to $500 million in assets as of 2018, the most recent data available. Average 401(k) fund expense ratios for each asset class are the averages of expense ratios for plans with $100 million to $250 million in assets, and plans with $250 million to $500 million in assets. Average numbers are shown for domestic equity, international equity, domestic bond, and non-target date balanced funds. 2018 ICI Study at 60.

[14] The "Actively Managed Average Expense Ratio" consists of the average annual report expense ratio of the least expensive share class of the twenty largest actively managed mutual funds by assets under management managed in a similar investment style. Averages are calculated separately for, global equity large cap, global equity mid-small, U.S. equity large cap, U.S. fixed income, and cautious allocation categories.

cost, nonproprietary options because doing so would have been contrary to Defendants' business interests.

45.     Had Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, Defendants would have removed the Plan's investments in Old Westbury Funds in favor of other nonproprietary funds that offered comparable investment management services and superior performance at significantly less expense. Given the excessive fees charged by the Old Westbury Funds in the Plan, and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to Bessemer Trust and its affiliates for their services was unreasonably high.

**B. Defendants Failed to Remove Underperforming Proprietary Funds**

46.     Defendants' favoritism toward proprietary investments is also displayed through the imprudent monitoring and retention of underperforming funds.

47.     In large part because of the high fees charged by the Old Westbury Funds, those investments tended to underperform, costing the Plan tens of millions of dollars in lost benefits that participants otherwise would have had in their accounts if the Plan's investments had been managed in a prudent and impartial manner. A prudent fiduciary offering high-fee options like the Old Westbury Funds would continuously monitor whether the extra fees were justified by a

reasonable expectation of increased returns. *See Baker*, 2020 WL 8575183, at *1 (noting that although ERISA "permits a financial services firm to offer its proprietary funds in its retirement plan ... an ERISA fiduciary has 'a continuing duty to monitor [plan] investments and remove imprudent ones.'") (citations omitted). Yet Defendants failed to do so and maintained an investment lineup whose actively managed funds were entirely proprietary despite prolonged underperformance in comparison to benchmarks and superior marketplace alternatives.

48.     Based on net investment returns compared to a universe of 2,440 peer plans with comparable data,[15] the Plan ranked in the bottom **one percent** in plan-wide returns over the five-year period ending 2015. This significant plan-wide underperformance is a direct result of the Old Westbury funds' struggles, as the Plan held only proprietary funds during this period. The introduction of Vanguard index funds to the Plan in 2017 helped mitigate the adverse impact of the proprietary funds' performance on plan-wide performance, but participants still suffered through plan-wide performance ranking in the bottom quintile over the five-year period ending 2020.

---

[15] This sample includes defined contribution plans with at least $100 million in assets as of the end of 2009, complete Form 5500 filings for each year 2009-2020, a 1/1 – 12/31 plan accounting year, and no investment in employer stock.

49.     Not only has the Plan ranked near the bottom in plan-wide performance, but it has incurred great amounts of risk while doing so. A common metric used to assess a portfolio's risk-adjusted return is the Sharpe Ratio.[16] The Sharpe Ratio removes the risk-free rate of return from a portfolio, as expressed through the yield of a United States Treasury bill, to determine whether returns associated with a portfolio are due to prudent investment decisions or a result of too much risk.

50.     For the Plan, its Sharpe Ratio ranked in the bottom 1.5% of peer plans over the five-years ending 2015 and remained near the bottom of peer rankings even after the addition of the Vanguard index funds, falling in the bottom 17% of plans over the five-year period ending 2020.

51.     This exceptionally poor plan-wide performance stems from the retention of Plan's underlying proprietary investments. To illustrate, one example of an imprudently retained fund is the Old Westbury Fixed Income fund, which serves as the Plan's only core fixed income investment, either passively or actively managed, and has been in the Plan throughout the statutory period. Leading up to and throughout the statutory period, this fund has consistently and materially

---

[16] *Sharpe Ratio*, INVESTOPEDIA, https://www.investopedia.com/terms/s/sharperatio.asp (last visited Jan. 256, 2022).

trailed its benchmark[17] as well as less expensive funds that share similar

investment objectives and risk, yet has nevertheless remained in the Plan:

| Fund (Ticker) | Net Expense Ratio | 2015 (5-Year Return) | 2016 (5-Year Return) | 2017 (5-Year Return) | 2018 (5-Year Return) | 2019 (5-Year Return) | 2020 (5-Year Return) |
|---|---|---|---|---|---|---|---|
| **Old Westbury Fixed Income (OWFIX)** | 0.57% | 1.73% | 1.01% | 0.66% | 0.98% | 1.88% | 2.97% |
| ***Bloomberg US Agg Bond TR USD*** | *n/a* | *3.25%* | *2.23%* | *2.10%* | *2.52%* | *3.05%* | *4.44%* |
| **American Funds Bond Fund of Am. R6 (RBFGX)** | 0.21% | 3.53% | 2.80% | 2.27% | 2.66% | 3.14% | 5.21% |
| **Baird Aggregate Bond I (BAGIX)** | 0.30% | 4.32% | 3.47% | 2.74% | 2.94% | 3.43% | 5.04% |
| **JPMorgan Core Bond R6 (JCBUX)** | 0.33% | 3.45% | 2.48% | 2.21% | 2.61% | 3.22% | 4.67% |
| **Western Asset Core Bond IS (WACSX)** | 0.42% | 4.25% | 3.60% | 3.21% | 3.45% | 4.02% | 5.60% |
| | | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Old Westbury Fund Expenses Paid by Participants** | | $216,000 | $279,000 | $298,000 | $298,000 | $455,000 | $527,000 |

52.     Moreover, this underperformance versus the fund's benchmark and

market alternatives is the product of the Old Westbury Fixed Income fund

managers' lack of skill, and not its risk profile, as demonstrated through an

analysis of the fund's alpha:[18]

---

[17] The listed Benchmark (Bloomberg US Agg Bond TR USD ) is that shown in the most recent participant fee disclosure, with historical returns calculated using Morningstar, a leading investment research platform.

[18] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply

| Fund (Ticker) | 2015 (5-Year Alpha)[19] | 2016 (5-Year Alpha) | 2017 (5-Year Alpha) | 2018 (5-Year Alpha) | 2019 (5-Year Alpha) | 2020 (5-Year Alpha) |
|---|---|---|---|---|---|---|
| Old Westbury Fixed Income (OWFIX) | -0.17 | -0.39 | -0.73 | -0.88 | -0.60 | -0.41 |
| American Funds Bond Fund of Am. R6 (RBFGX) | 0.32 | 0.52 | 0.14 | 0.17 | 0.19 | 0.86 |
| Baird Aggregate Bond I (BAGIX) | 1.03 | 1.16 | 0.60 | 0.41 | 0.39 | 0.44 |
| JPMorgan Core Bond R6 (JCBUX) | 0.60 | 0.42 | 0.24 | 0.20 | 0.21 | 0.15 |
| Western Asset Core Bond IS (WACSX) | 1.17 | 1.31 | 1.05 | 0.91 | 1.03 | 0.99 |

53.    A prudent fiduciary would have removed the Old Westbury Fixed

Income fund from the Plan given its significant underperformance leading up to

and throughout the statutory period. The fact that Defendants retained this

proprietary fund in spite of its consistent underperformance versus its benchmark

and superior alternatives in the marketplace, and its negative alpha, supports an

inference that Defendants' process for monitoring the Plan's investments was self-

interested and imprudent.

54.    Another illustrative example of Defendants' flawed monitoring

process is the retention of the Old Westbury Large Cap Strategies fund, which has

been in the Plan throughout the statutory period. Like the Old Westbury Fixed

Income fund, the Old Westbury Large Cap Strategies fund has failed to keep pace

---

tracking the benchmark. *See Alpha*, INVESTOPEDIA,
https://www.investopedia.com/terms/a/alpha.asp (last visited Jan. 26, 2022)
[19] Alpha's calculation benchmark is the Bloomberg US Aggregate Bond TR USD
index.

with its benchmark[20] and less expensive funds that share similar investment

objectives and risk:

| Fund (Ticker) | Net Expense Ratio | 2015 (5-Year Return) | 2016 (5-Year Return) | 2017 (5-Year Return) | 2018 (5-Year Return) | 2019 (5-Year Return) | 2020 (5-Year Return) |
|---|---|---|---|---|---|---|---|
| **Old Westbury Large Cap Strategies (OWLSX)** | 1.10% | 5.11% | 9.87% | 10.68% | 3.91% | 7.19% | 10.54% |
| ***MSCI ACWI Growth NR USD*** | *n/a* | *7.35%* | *9.71%* | *12.10%* | *5.72%* | *10.70%* | *16.94%* |
| **American Funds New Economy R6 (RNGGX)** | 0.42% | 13.12% | 14.94% | 16.79% | 7.74% | 11.90% | 17.68% |
| **Artisan Global Opportunities I (APHRX)** | 0.89% | 10.90% | 13.54% | 13.77% | 6.87% | 13.07% | 19.10% |
| **Morgan Stanley Inst Global Opp IS (MGTSX)** | 0.81% | 13.65% | 15.05% | 22.34% | 12.99% | 18.03% | 24.62% |
| **T. Rowe Price Global Stock I (TRGLX)** | 0.66% | 9.23% | 13.26% | 16.36% | 9.03% | 14.29% | 22.65% |
| | | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Old Westbury Fund Expenses Paid by Participants** | | $937,000 | $1,050,000 | $1,140,000 | $1,000,000 | $1,220,000 | $1,540,000 |

---

[20] Benchmark is that shown in the most recent participant fee disclosure, with historical returns calculated using Morningstar, a leading investment research platform.

55.    Likewise, the Large Cap Strategies' underperformance is the product of a lack of skill, as exhibited through the fund's inferior alpha, and not its risk profile:

| Fund (Ticker) | 2015 (5-Year Alpha)[21] | 2016 (5-Year Alpha) | 2017 (5-Year Alpha) | 2018 (5-Year Alpha) | 2019 (5-Year Alpha) | 2020 (5-Year Alpha) |
|---|---|---|---|---|---|---|
| Old Westbury Large Cap Strategies (OWLSX) | -1.66 | 0.71 | -0.31 | -1.23 | -2.20 | -4.30 |
| American Funds New Economy R6 (RNGGX) | 5.86 | 5.11 | 4.51 | 2.15 | 1.22 | 0.81 |
| Artisan Global Opportunities I (APHRX) | 3.37 | 3.19 | 1.06 | 1.05 | 2.16 | 2.54 |
| Morgan Stanley Inst Global Opp IS (MGTSX) | 5.44 | 5.11 | 8.61 | 6.69 | 6.28 | 6.26 |
| T. Rowe Price Global Stock I (TRGLX) | 0.99 | 2.27 | 2.87 | 2.90 | 2.49 | 3.57 |

56.    The ongoing retention of the Old Westbury Funds, including the Core Fixed Income and Large Cap Strategies, in the face of their high fees, significant underperformance, and overall disfavor within the marketplace, and despite the availability of superior alternatives in the marketplace, reflects a fiduciary process imprudently and disloyally tilted in Defendants' favor.

57.    The only occasion in which an Old Westbury fund was removed from the Plan during the statutory period was in 2020 when Old Westbury Multi-Asset

---

[21] Alpha's calculation benchmark is the MSCI ACWI Growth NR USD index.

Opportunities was withdrawn from the menu. This removal, however, was not the result of a prudent and loyal review of the fund, but instead a default result of the fund's marketplace liquidation in September 2020. While other investors fled the Multi-Asset Opportunities fund and divested over $3 billion in assets from the fund in the twelve months leading up to liquidation, Defendants stubbornly continued to retain it in the Plan until it ultimately closed and ceased operations.

58.     The foregoing examples are illustrative of overall struggles within the Old Westbury Funds generally. Given their high costs, poor performance, and lack of utilization among fiduciaries of other similarly sized plans, it was imprudent to retain these funds in the Plan. Defendants improperly retained these funds to serve their business interests, not participants' interests, and generate additional investment fee income for Bessemer Trust and its affiliates. The retention of the Plan's proprietary funds under these circumstances is indicative of Defendants' breaches of their fiduciary duties of prudence and loyalty.[22]

---

[22] When asset management companies such as Bessemer Trust favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. FIN. 1779 (Aug. 2016). Further, this poor performance tends to persist, empirically demonstrating that "the decisions to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808-10. A study of third-party administrators such as Bessemer Trust similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi

### C. Defendants Utilized an Imprudent and Disloyal Fund Selection Process

59.     Defendants' imprudent and disloyal process for managing the Plan's investment menu also extended to the selection of new actively managed funds for the Plan. Despite the uniform non-utilization of Old Westbury Funds by other fiduciaries, Defendants failed to look outside the confines of Bessemer Trust-affiliated funds for the Plan's actively managed investment options.

60.     During the statutory period, Defendants added one actively managed fund to the Plan, Old Westbury Credit Income. This addition took place in 2020, less than *three months* after the fund's inception and without any meaningful track record. With no track record to assess, the inference may be drawn that Defendants' acted imprudently and disloyally in selecting the Old Westbury Credit Income fund for the Plan. *See*, *e.g.*, *Troudt v. Oracle Corporation*, Civ. Action No. 1:16-cv-00175-REB-CBS, 2017 WL 1100876, at *2 (D. Colo. Mar. 22, 2017) (denying motion to dismiss where plaintiffs alleged in part that funds added to the plan had inadequate performance histories to warrant investment in them at all).

61.     Defendants' reckless use of Plan assets to seed this new proprietary fund has harmed Plan participants.  In the time since the fund's inception, Credit Income has materially underperformed many established, lower-cost market

Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. Fin. Res. 5 (Spring 2016).

comparators with proven track records.  The following chart provides some examples:

| Fund (Ticker) | Net Expense Ratio | 10/1/20 – 12/31/21 Cumulative Performance |
|---|---|---|
| Old Westbury Credit Income (OWCIX) | 0.90% | 6.05% |
| Fidelity Strategic Income (FADMX) | 0.67% | 9.20% |
| JPMorgan Income R6 (JMSFX) | 0.40% | 7.37% |
| PIMCO Income I (PIMIX) | 0.62% | 7.18% |

62.     With the addition of the Old Westbury Credit Income fund to the Plan, *all* non-municipal bond mutual funds managed by Bessemer Trust were included on the Plan's investment menu.[23] The addition of the Credit Income fund to the Plan, mere months after its inception, paired with the presence of all other non-municipal bond Old Westbury funds (none of which were adopted by fiduciaries of other similarly sized plans), further indicates that Defendants' process for managing the Plan's investments was imprudent and tainted with self-interest.

## II.   PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

63.     Plaintiff did not have knowledge of all material facts (including, among other things, the actions of similarly situated fiduciaries, the availability of

---

[23] Municipal bond funds are exempt from federal taxes. As 401(k) plans, like the Plan, are tax-deferred investment vehicles, the added tax benefits municipal bond funds provide are irrelevant to participants, and therefore municipal bond funds are rarely, if ever, included in a plan's investment lineup.

less expensive investment alternatives, the costs of the Plan's investments compared to those in similarly sized plans, investment performance versus other available alternatives in similarly sized plans, and plan-wide performance versus other similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before the suit was filed. Further, Plaintiff does not have actual knowledge of the details of Defendants' decision-making processes with respect to the Plan (including Defendants' specific processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

64.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

65.    Plaintiff asserts his claims in Counts I–II on behalf of a class of participants and beneficiaries of the Plan defined as follows:[24]

> All participants and beneficiaries of the Bessemer Trust Company 401(k) and Profit Sharing Plan invested in funds managed by Bessemer Trust Company or its affiliates at any time on or after January 26, 2016, excluding any persons with responsibility for the Plan's investment or administrative functions.

66.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 1,000 to 1,300 participants at all relevant times during the applicable period.

67.    <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff participated in the Plan during the class period and suffered financial harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal investment decisions affected all Plan participants similarly.

68.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and Plaintiff has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with

---

[24] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

any Class members that would impair or impede his ability to represent such Class members.

69.   Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.   Whether Defendants are fiduciaries with respect to the Plan;

      b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

      c.   The proper form of equitable and injunctive relief; and

      d.   The proper measure of monetary relief.

70.   Class certification is appropriate under Fed R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

71.   Class certification is also appropriate under Fed R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and

restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

72.     Class certification is also appropriate under Fed R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting individual class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Fiduciary Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

73.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

74.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendants in connection with the administration of the Plan and the selection and monitoring of Plan investments.

75.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with appropriate care, skill, diligence, and prudence. Further, Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

76.     As described throughout the Complaint, Defendants failed to prudently and objectively monitor the Plan's proprietary investments to ensure that each of the Plan's proprietary investments were and remained appropriate for the Plan. Defendants uniquely retained Bessemer-affiliated funds as Plan investments

despite the availability of superior alternative investments from other firms that would have cost Plan participants significantly less. Further, Defendants imprudently selected proprietary investments for the Plan and improperly favored proprietary investments over superior, less costly non-proprietary investment alternatives in their investment selection process.

77.     Based on the conduct described above and throughout this Complaint, it is evident that Defendants did not make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Bessemer Trust Company and its affiliates. Through their actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

78.     Further, each of the actions and omissions described in paragraph 77 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an

enterprise of like character and with like aims, in violation of 29 U.S.C.

§ 1104(a)(1)(B).

79.     As a consequence of Defendants' fiduciary breaches, the Plan and its

participants suffered millions of dollars in losses.  Defendants are liable, under

29 U.S.C. §§ 1109 and 1132, to make good to the Plan all such losses resulting

from the aforementioned fiduciary breaches.

80.     Each Defendant knowingly participated in each breach of the other

Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit breaches by failing to lawfully discharge such Defendant's own duties, and

knew of the breaches by the other Defendants and failed to make any reasonable

and timely effort under the circumstances to remedy the breaches. Accordingly,

each Defendant is also liable for the losses caused by the breaches of its co-

fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

81.     The Committee and its members (as well as Bessemer Trust

Company) are fiduciaries of the Plan with responsibilities relating to the selection

and monitoring of Plan investment options.

82.     Bessemer Trust Company is responsible for appointing and removing

members of the Committee. Bessemer Trust Company therefore has a fiduciary

responsibility to monitor the performance of the Committee and its members.

83.     A monitoring fiduciary must ensure that its appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when they fail to perform their fiduciary obligations in accordance with ERISA.

84.     Bessemer Trust Company breached its fiduciary monitoring duties by, among other things:

    a.  failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

    b.  failing to monitor the processes by which Plan investments were selected, monitored, and retained, which would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

    c.  failing to remove Committee members whose performance was inadequate in that they selected and retained imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

85.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment performance.

86.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Bessemer Trust Company is liable to restore the Plan all losses suffered as a result

of the fiduciary breaches that resulted from its failure to properly monitor its

appointed fiduciaries on the Committee.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jubril Pecou, individually, as the representative of

the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A declaration that Defendants breached their fiduciary duties under ERISA;

D.  An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.  An order enjoining Defendants from any further violation of ERISA;

F.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

G.  An award of pre-judgment interest;

H.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.  An award of such other and further relief as the Court deems equitable and just.

Dated: January 26, 2022

 s/ Katrina Carroll
Katrina Carroll
NJ Bar No. 026212000
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (773) 598-5609
katrina@lcllp.com

Edward W. Ciolko
NJ Bar No. 005462002
**LYNCH CARPENTER LLP**
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
Telephone: (267) 609-1990
Facsimile: (412) 231-0246
eciolko@lcllp.com

Paul J. Lukas, MN Bar No. 022084X*
Kai Richter, MN Bar No.0296545*
Brock J. Specht, MN Bar No. 0388343*
Steven J. Eiden, MN Bar No. 0402656*
**NICHOLS KASTER, PLLP**
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
seiden@nka.com

*Attorneys for Plaintiff*

**pro hac vice* motions to be filed

42

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

Undersigned counsel certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 26, 2022

<div style="margin-left:40%">

s/ Katrina Carroll
Katrina Carroll
NJ Bar No. 026212000
**LYNCH CARPENTER, LLP**
111 W. Washington, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (773) 598-5609
katrina@lcllp.com

</div>